**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JEFF TOLLAKSEN and JEFFREY PARKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CAPITAL ONE FINANCIAL CORPORATION; CAPITAL ONE, N.A.; WIKIBUY, LLC; and WIKIBUY HOLDINGS, LLC,<br><br>Defendants. | Civil Action No. 1:25-cv-01426-MSN-IDD |

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE REPORTS AND EXCLUDE THE TESTIMONY OF JONATHAN JAFFE

## TABLE OF CONTENTS`5YU7


TABLE OF AUTHORITIES ........ ii

TABLE OF EXHIBITS ........ v

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. MR. JAFFE'S QUALIFICATIONS ........ 2

II. MR. JAFFE'S OPINIONS ........ 2

A. "Under-Rewarded" Purchases (Opinion 4) ........ 2

B. "Unrewarded" Purchases (Opinion 5) ........ 8

C. Other Opinions ........ 9

LEGAL STANDARDS ........ 13

ARGUMENT ........ 14

I. MR. JAFFE IS NOT AN EXPERT ON AFFILIATE MARKETING ........ 14

II. OPINION 4 IS UNSUPPORTED, UNRELIABLE, AND UNHELPFUL. ........ 16

A. Mr. Jaffe's Calculation of Purported Damages for [redacted] Type Reward Offers Is Based on a Fundamental Misunderstanding of Basic Facts. ........ 16

B. Mr. Jaffe's Methodology Fails to Identify Plaintiffs' Challenged Transactions and Fails to Identify Plaintiffs as Class Members. ........ 18

C. Mr. Jaffe's *Ipse Dixit* Is Unreliable and Unsupported. ........ 19

III. OPINION 5 IS UNRELIABLE AND SPECULATIVE ........ 21

IV. OPINIONS 4 AND 5 ARE ADDITIONALLY UNRELIABLE BECAUSE THEY DO NOT ACCOUNT FOR INDIVIDUALIZED ISSUES. ........ 22

V. MR. JAFFE'S REMAINING OPINIONS AND TESTIMONY SHOULD BE EXCLUDED FOR A HOST OF REASONS. ........ 25

A. Mr. Jaffe's Remaining Opinions Lack Any Factual Basis or Methodology ........ 25

B. Mr. Jaffe's Report Contains Impermissible Narrative Testimony. ........ 26

C. Mr. Jaffe's Report Contains Speculative State-of-Mind Testimony. ........ 28

D. Mr. Jaffe's Report Contains Improper Legal Opinions. ........ 28

E. Mr. Jaffe May Not Present Arithmetic as Expert Opinion. ........ 29

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Training Grp. Worldwide, Inc. v. Proactive Techs. Inc.*,
2020 WL 4574493 (E.D. Va. Aug. 7, 2020)....29

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
2022 WL 3021560 (D. Del. July 29, 2022)....30

*Bradley v. Amazon.com, Inc.*,
2023 WL 2574572 (E.D. Pa. Mar. 17, 2023)....30

*Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*,
144 F.4th 238 (4th Cir. 2025)....29

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998)....23

*In re C. R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
2018 WL 4212409 (S.D. W. Va. Sept. 4, 2018)....28

*In re C. R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
2018 WL 4219563 (S.D. W. Va. Sept. 5, 2018)....26, 28

*In re C. R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
2018 WL 514798 (S.D. W. Va. Jan. 23, 2018)....27

*Cape Fear Pub. Util. Auth.*, *Brunswick Cnty. v. Chemours Co. FC, LLC*,
2026 WL 2323094 (E.D.N.C. Apr. 20, 2026)....26, 29

*Concordia Pharm., Inc. v. Method Pharm., LLC*,
2016 WL 1464639 (W.D. Va. Apr. 13, 2016)....18

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001)....14

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....14, 18, 19, 20

*Davis v. Capital One, N.A.*,
2023 WL 6964051 (E.D. Va. Oct. 20, 2023), *aff'd*, 2025 WL 2445880 (4th Cir. Aug. 26, 2025)....*passim*

*Donnert v. Feld Ent., Inc.*,
2013 WL 12097618 (E.D. Va. Nov. 8, 2013)....29

*Est. of Myers v. Walmart Stores, Inc.*,
2011 WL 1366459 (E.D.N.C. Apr. 11, 2011)....15

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....14, 20, 22

*Good v. Am. Water Works Co.*,
310 F.R.D. 274 (S.D. W. Va. 2015)....23, 25

*Grande Vista, LLC v. United States*,
680 F. Supp. 3d 550 (D. Md. 2023)....14

*Hernandez Reid v. Geo Grp., Inc.*,
2026 WL 1365021 (E.D. Va. May 15, 2026)....18

*Hetzel v. JPMorgan Chase Bank, N.A.*,
2017 WL 603286 (E.D.N.C. Feb. 14, 2017)....15, 31

*Hines v. Wyeth*,
2011 WL 2680842 (S.D. W. Va. July 8, 2011)....27, 28

*Huskey v. Ethicon, Inc.*,
29 F. Supp. 3d 691 (S.D. W. Va. 2014)....28

*Johnson v. Time Warner Ent.-Advance/Newhouse P'ship*,
2017 WL 3765551 (D.S.C. Aug. 31, 2017)....19, 21

*Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*,
2019 WL 1756292 (W.D. Va. Apr. 19, 2019)....26

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)....13

*Mission 1st Grp., Inc. v. Mission First Sols., LLC*,
2024 WL 5058007 (E.D. Va. Dec. 10, 2024)....15, 22

*Newkirk v. Enzor*,
2017 WL 823553 (D.S.C. Mar. 2, 2017)....27

*Palmer v. Big Lots Stores, Inc.*,
2015 WL 165315 (E.D. Va. Jan. 12, 2015)....18

*Sardis v. Overhead Door Corp.*,
10 F.4th 268 (4th Cir. 2021)....20, 21, 22, 26

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001)....14, 15

*Small v. WellDyne, Inc.*,
927 F.3d 169 (4th Cir. 2019) ....................20

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
878 F.2d 791 (4th Cir. 1989) ....................14

*In re Trasylol Prods. Liab. Litig.*,
709 F. Supp. 2d 1323 (S.D. Fla. 2010) ....................27

*TruAuto MC, LLC v. Textron Specialized Vehicles, Inc.*,
2021 WL 4167454 (D.S.C. Sept. 14, 2021)....................30

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
29 F.3d 137 (4th Cir. 1994) ....................14, 16, 21, 23

*Tyree v. Bos. Sci. Corp.*,
54 F. Supp. 3d 501 (S.D. W. Va. 2014)....................27, 28

*United States v. Chapman*,
209 F. App'x 253 (4th Cir. 2006) ....................29

*United States v. Coontz*,
810 F. App'x 201 (4th Cir. 2020) ....................29

*United States v. Curry*,
965 F.3d 313 (4th Cir. 2020) (Thacker, J., concurring)....................16

*United States v. Nji*,
159 F.4th 259 (4th Cir. 2025) ....................28

*In re Zetia (Ezetimibe) Antitrust Litig.*,
2021 WL 6690337 (E.D. Va. Aug. 16, 2021)....................29

**Other Authorities**

Federal Rule of Evidence 702.................... *passim*

## TABLE OF EXHIBITS

| Exhibit # | Description |
|---|---|
| 1 | Expert Report of Jonathan Jaffe (Aug. 19, 2026) ("Jaffe Report" or "Report") |
| 2 | Deposition of Jonathan Jaffe (Oct. 9, 2026) ("Jaffe Dep.") |
| 3 | Curriculum Vitae of Jonathan Jaffe ("Jaffe CV") |
| 4 | Expert Report of Lorin M. Hitt (Sept. 22, 2026) ("Hitt Report") |
| 5 | Deposition of Adam Gauvin (July 8, 2026) ("Gauvin Dep.") |
| 6 | Transcript of Pretrial Conference Hearing (Oct. 15, 2026) ("10/15 Tr.") |
| 7 | Rules for Rewards Payouts ("COS_Tollaksen_00073679") |
| 8 | Slack Message Thread (Oct. 26, 2020) ("COS_Tollaksen_00012624") |
| 9 | Rebuttal Report of Jonathan Jaffe (Oct. 2, 2026) ("Jaffe Rebuttal") |
| 10 | Expert Report of Georgios Zervas (Sept. 22, 2026) ("Zervas Report") |
| 11 | Letter from J. Fugitt to D. Straite (July 16, 2026) |
| 12 | Email to Capital One Shopping Support (Mar. 21, 2025) ("TOLLAKSEN009910") |
| 13 | Plaintiff Tollaksen's Fifth Supplemental Responses to Defendants' First Set of Interrogatories ("Plaintiff Tollaksen's 5th Supp. Resp.") |
| 14 | Table Summarizing Jonathan Jaffe's Proffered Testimony |

## INTRODUCTION

Plaintiffs seek more than [redacted] in damages from Capital One Shopping ("COS") for allegedly "under-rewarded" transactions based solely on the opinion of their purported expert, Jonathan Jaffe. But Mr. Jaffe's proposed methodology reflects fundamental, easily identifiable errors that inflate his damages calculation by 99.9%, while failing to identify Plaintiffs' own purchases as "under-rewarded." Among other things, Mr. Jaffe's calculation, which essentially consists of multiplying one number by another number for each of the millions of purchases made by COS users during the proposed class period, multiplies by the *wrong number* because Mr. Jaffe misunderstood COS's data. When all of Mr. Jaffe's errors are corrected, his damages figure collapses to less than [redacted].

As set forth in detail below, four independent bases exist to exclude Mr. Jaffe's opinions. First, Mr. Jaffe, a self-styled "data scientist," is utterly unqualified to opine on affiliate marketing, though he does so throughout his opening and rebuttal reports. Second, and as previewed above, Mr. Jaffe's proposed methodology for identifying under-rewarded purchases is fatally flawed and manifestly at odds with the evidence in the case. Third, Mr. Jaffe does not attempt to identify any allegedly "unrewarded" purchases; he merely asserts that he could in the future, without describing a methodology for doing so. And fourth, Mr. Jaffe's remaining opinions are a rambling hodgepodge of improper material, including legal opinions, speculation about Defendants' mental state, and summaries of record evidence.

Mr. Jaffe is not an expert on the matters on which he seeks to opine, and his proffered opinions would be highly misleading, not helpful, to the jury. His opinions should be excluded.

<u>**BACKGROUND**</u>

## I. MR. JAFFE'S QUALIFICATIONS

Plaintiffs' proffered expert Jonathan Jaffe is a self-styled "technology consultant" and "data scientist." Jaffe Report ¶ 2; Jaffe Dep. at 65:4–7. Mr. Jaffe earned a bachelor's degree in economics in 1999 and since then has worked in technology consulting and litigation support. Jaffe CV at 1–2. Currently, he is the sole proprietor of Its-Your-Internet, a "software, data, and litigation support consulting firm." Jaffe Report ¶ 2; Jaffe CV at 1; Jaffe Dep. at 56:25–57:20. Although Mr. Jaffe has acted as an expert witness before, much of his litigation work has been as a non-testifying "ESI Representative." Jaffe CV at 1; *see* Jaffe Dep. at 57:25–58:14 (describing experience as [redacted]); *id.* at 74:23–24 (similar). Mr. Jaffe has never worked in the affiliate marketing industry or performed any academic work related to affiliate marketing. His affiliate marketing experience consists mainly of acting as an expert for plaintiffs in litigation related to affiliate marketing. *See* Jaffe CV; Jaffe Dep. at 84:5–7, 86:10–18.

## II. MR. JAFFE'S OPINIONS

Plaintiffs retained Mr. Jaffe to opine regarding [redacted]. Jaffe Report ¶ 526. Mr. Jaffe's numerous opinions extend far beyond this assignment.

### A. "Under-Rewarded" Purchases (Opinion 4)

Mr. Jaffe opines that [redacted] *See id.* ¶ 560; Jaffe Dep. at 99:1–10. His proposed methodology for identifying such purchases is deceptively simple. He relies upon just one of the approximately [redacted] He excludes certain records based on, e.g., [redacted]

[redacted] Then he performs simple arithmetic on each of the remaining records. Specifically, for each non-excluded record in [redacted], Mr. Jaffe multiplies the value in a field called [redacted] by the value in a different field called [redacted] and asserts that the product is the reward amount the user should have received. Jaffe Report ¶¶ 560–64, 575, 585, 594–96; Hitt Report ¶ 52. His report includes a separate calculation for each of the five types of rewards COS offers,[1] but for each the approach is to multiply [redacted] It is arithmetic, nothing more. Not only that, it is based on an erroneous assumption that leads to a massively overstated damages figure.

Of Mr. Jaffe's over [redacted] in estimated damages, more than 99% are attributable to what are referred to as [redacted] offers. *Id.* ¶ 54. For such cut offers, COS calculates the reward amount paid to users [redacted] to ensure that the user's reward equals the expected percentage of the purchase price. For example, if COS offers rewards of "up to 20%" of the sale price at a given merchant, and it expects to receive a commission from that merchant of 10% of the sale price, COS calculates the user's reward [redacted]—the user sees the "up to 20%" offer.[2]

[1] [redacted]

[2] COS calculates [redacted] Hitt Report ¶ 56; Gauvin Dep. at 145:15–146:7. For those reasons,

To illustrate with a real-life example, and as explained in the report of Defendants' expert, Dr. Lorin Hitt: Plaintiff Tollaksen received and activated a [redacted] type offer for "up to 20% Back" on a purchase from Groupon, then completed a $40.50 Groupon purchase. *Id.* ¶¶ 61–62. COS's data records this as a [redacted] *Id.* ¶ 62. COS received [redacted] in commission, and Plaintiff Tollaksen received a reward of $8.10—i.e., [redacted] or 20% of his $40.50 purchase, exactly as promised. *Id.*

Mr. Jaffe's methodology, however, does not calculate [redacted] rewards in this way. Mr. Jaffe apparently erroneously believed, at least until his deposition, that the [redacted] offers, contains the rewards rate shown to the user. *See* Jaffe Dep. at 149:8–12 ([redacted] A. "That is my general understanding ….”). Thus, Mr. Jaffe calculates the reward due by multiplying the value in the [redacted]t field by the [redacted] As applied to the above Groupon transaction, however, Mr. Jaffe's methodology yields the absurd result that Plaintiff Tollaksen should have received rewards equaling *200% of his purchase price*, or $81.00—an amount Plaintiff Tollaksen does not even seek in this litigation. Hitt Report ¶ 62. Mr. Jaffe makes the same mistake across the entire class, grossly inflating his damages estimate. Correcting that error, alone, reduces his damages estimate from [redacted].[3] *Id.* ¶ 63.

Underscoring his unreliability, Mr. Jaffe seems not to have grasped his mistake until his deposition, during which he insisted that the parties agreed that the [redacted] field contained

---

COS relies upon [redacted] Hitt Report ¶ 56 & n.71; Gauvin Dep. at 146:1–7.

[3] Plaintiffs have stated their intention to "supplement" Mr. Jaffe's report, effectively conceding that Mr. Jaffe's methodology is wrong. 10/15 Tr. at 7:2–4. Defendants reserve the right to move to strike any such supplemental report.

the rewards rate shown to the user for [redacted] offers. Mr. Jaffe was unable to point to any testimony or documents supporting his understanding. *See* Jaffe Dep. at 151:9–15; *id.* at 154:18–155:11 [redacted]"); *id.* at 155:12–156:1 (same for documents). He claimed to have validated his understanding, but he could not say how many [redacted] offers he had reviewed for that purpose. *See id.* at 176:5–179:22 (asserting [redacted]); *id.* at 151:7–10, 152:4–15, 180:8–25 (similar).

In reality, the record evidence shows that for [redacted] *does not* correspond to the rewards rate presented to a user. COS internal documents explain how rewards on [redacted] type offers are calculated. *See* COS_Tollaksen_00073679 at 80 [redacted])[4]; COS_Tollaksen_00012624 ([redacted]. For *all 15* of Plaintiff Tollaksen's [redacted] transactions, the rewards rate presented to him was *not* the same as the value in the [redacted] field. Jaffe Dep. at 199:22–200:21. This fact alone should have been enough to cause Mr. Jaffe to recognize his error, but it was not.

At his deposition, Mr. Jaffe acknowledged the absurd—and incorrect—results of his approach of treating [redacted] as the rewards rate shown to the user. *See id.* at 225:24–230:5, 235:10–25 [redacted]); *id.* at 237:9–239:21, 242:18–243:8 [redacted]); *id.* at 301:10–305:10, 306:5–23 [redacted]. For those same transactions, Mr. Jaffe acknowledged that the rewards rates presented to users did not, in fact, match the value in the [redacted] field. *See id.* at 232:20–25 (acknowledging offer

[4] In other words, [redacted]

listed up to [redacted]); *id.* at 241:18–242:17, 244:2–247:1 [redacted]); *id.* at 305:10–306:4, 307:10–308:12 ([redacted]). Indeed, Mr. Jaffe's methodology for calculating rewards would have resulted in COS paying out [redacted] offers during the class period while receiving just [redacted]—resulting in [redacted] in losses, an economically implausible result for any business. Hitt Report ¶ 63.

When Mr. Jaffe was confronted with transactions that revealed his error, rather than admit his mistake, he doubled down, insisting the examples presented to him were [redacted] Jaffe Dep. at 150:23–151:2, 307:10–308:12 (asserting transactions were [redacted]). At the same time, he acknowledged that, if his understanding was wrong, his "calculation" might need to change. *Id.* at 247:2–22, 308:12–16, 310:4–18 (testifying [redacted]). Finally, Mr. Jaffe asserted that he would [redacted]

In the same footnote 477, Mr. Jaffe points to unspecified "documents" purportedly [redacted]. Jaffe Report ¶ 560 n.477; Jaffe Dep. at 107:12–19. But he does not describe any methodology for identifying such instances—which is not surprising because there is no evidence to support his accusation that COS [redacted]. *See* Jaffe Dep. at 112:21–113:11 [redacted]); *id.* at 103:10–104:5 (similar); Jaffe Rebuttal ¶ 28 (similar). Nor does Mr. Jaffe's October 2 rebuttal report include such a methodology, even though Defendants had produced the tables referenced in footnote 477 by

then. *See* Hitt Report ¶¶ 80–85; Jaffe Dep. at 193:22–194:10 [redacted]).[5]

The errors described above are not the only ones that afflict Mr. Jaffe's Opinion 4. Mr. Jaffe also fails, for example, to account for offer-specific caps on rewards that were clearly disclosed to users with each offer (e.g., "earn 20% rewards *up to $250*"). He similarly fails to account for the $100 limitation-of-liability provision in COS's terms of service. Hitt Report ¶¶ 64–71. Accounting for these and other methodological errors reduces Mr. Jaffe's total damages calculation from over [redacted]. *Id.* ¶ 71.

Finally, and separate and apart from the numerous factual errors undermining Mr. Jaffe's Opinion 4, his Opinion 4 also fails to consider various individualized factors that can affect rewards eligibility, such as whether the purchase included an item that was excluded from the rewards offer, was made using a non-COS coupon, or included canceled or returned items. Ironically, Mr. Jaffe found it necessary to consult offer emails and order confirmations to identify whether these same factors affected Plaintiffs' own purchases—but he proposed no methodology for addressing those issues classwide. *See* Jaffe Dep. at 119:6–14 (admitting methodology does not [redacted]). Mr. Jaffe's opinions similarly ignore that multiple user-side factors—such as browsing in incognito mode, using virtual private networks ("VPNs") and ad blockers, or using competing discount services—may affect COS's ability to track and record user data. Zervas Report ¶¶ 65–73. And Mr. Jaffe also ignores that merchant-side factors (such as exclusions and merchants' own capabilities to track and record user data) and affiliate network-side factors (such

---

[5] During his deposition, Mr. Jaffe variously asserted—without evidence or explanation—that all 15 of Plaintiff Tollaksen's [redacted] transactions were examples [redacted] and argued that was why his Opinion 4 methodology did not capture *any* of Plaintiff Tollaksen's [redacted] *See* Jaffe Dep. at 190:3–191:5, 193:2–7, 200:22–201:3, 205:3–211:2, 221:24–222:3.

as attribution rules and other policies) may also affect COS's data tracking. *Id.* ¶¶ 74–79. Mr. Jaffe's methodology does not account for any of these individualized factors, further rendering it fundamentally unreliable. *See also* Jaffe Dep. at 36:12–41:10, 44:12–18, 44:22–45:11, 45:20–46:4, 48:10–14 (did not account for results of device inspections); *id.* at 119:15–120:7 (did not consider emails).

### B. "Unrewarded" Purchases (Opinion 5)

Mr. Jaffe asserts that COS "[redacted] Jaffe Report ¶ 598. Mr. Jaffe testified that the only bases for this opinion were Plaintiffs' own [redacted] and unspecified COS documents mentioning [redacted]. Jaffe Dep. at 250:3–251:9.

Mr. Jaffe's reports do not include an estimate of damages related to allegedly unrewarded purchases or even propose a methodology for producing such an estimate. *Id.*; Hitt Report ¶¶ 109–10. Among other things, Mr. Jaffe provides no classwide methodology for identifying untracked "unrewarded" transactions or determining whether they included eligible purchases. *Id.* ¶¶ 92–108; Zervas Report ¶ 94.

Instead, Mr. Jaffe contends [redacted] to conduct such an analysis. Jaffe Report ¶ 598; Jaffe Dep. at 251:10–25 ([redacted]). Defendants produced those tables on September 22, 2026, 10 days before Mr. Jaffe submitted his rebuttal report,[6] but he still did not perform the analysis. When asked at his

---

[6] Plaintiffs may argue that Defendants should have produced the tables sooner. But Defendants offered to resolve a discovery dispute by producing the [redacted]l table, and [redacted] other tables, in a July 16, 2026 letter. *See* 7/16/2026 Letter from J. Fugitt to D. Straite at 2 ("Defendants are prepared to produce yet more data to address Plaintiffs' inquiries, [redacted]"); *id.* at 2–10 (listing tables). Plaintiffs never responded to this letter and instead served an expert report more than a month later on August 19, 2026, complaining about lack of access to data they opted not to pursue.

deposition why not, Mr. Jaffe variously said it was because he had not been asked to, he did not have time because he was preparing for his deposition (on which he said he spent 9.2 hours), he was working on other cases, and he did not want to [redacted][7] In fact, Mr. Jaffe admitted that his deposition was the [redacted] contained in the supposedly critical [redacted] table. Jaffe Dep. at 211:15–212:1 ([redacted]); *id.* at 216:20–217:8 [redacted]). In his rebuttal report, Mr. Jaffe also speculates about *another* [redacted], containing further unspecified information. Jaffe Rebuttal ¶¶ 34, 119.

### C. Other Opinions

Mr. Jaffe also proffers conclusory opinions on a wide range of COS's purported technological capabilities. Many of these assertions are "disclosed" in a single paragraph (or sentence) and contain no reasoning, analysis, methodology, or citations.

***Reasonably Identifying Users (Opinions 1 & 2).*** Mr. Jaffe opines that COS's databases [redacted] Jaffe Report ¶ 555. However, Mr. Jaffe is unable to locate one of Plaintiffs' own user IDs in the data. *Id.* Mr. Jaffe also asserts that COS [redacted]. *Id.* ¶ 556.

[7] *Id.* at 9:20–22, 11:4–7 (discussing time spent preparing); *id.* at 110:20–111:9 [redacted]"); *id.* at 111:16–18 [redacted]); *id.* at 193:11–194:24 [redacted]); *id.* [redacted]); *id.* at 252:1–253:11 [redacted]).

***Contemporaneously Recording Data (Opinion 3).*** Mr. Jaffe opines that [redacted] *Id.* ¶ 559. Mr. Jaffe does not define the term [redacted] cite any record evidence, or provide any methodology. Mr. Jaffe does not address the fact that certain user actions—such as using an ad blocker or VPN, browsing in incognito mode, or using the browser extensions or mobile applications of competing discount services—may interfere with COS's tracking and recording of data. Zervas Report ¶ 84.

***Retroactively Crediting Rewards (Opinion 6).*** Mr. Jaffe asserts that COS can [redacted]" Jaffe Report ¶ 600. Mr. Jaffe does not define or quantify the term [redacted] cite any record evidence, or provide any methodology. *Id.* Mr. Jaffe instead extrapolates from (1) the fact that [redacted] and (2) the fact that COS has sometimes manually issued rewards to users. *Id.*

***Identifying Offers Featuring Excluded Items with AI (Opinion 7).*** Mr. Jaffe asserts without support that COS [redacted]. *Id.* ¶ 601. He asserts that COS can build an AI model and use it to identify [redacted] *Id.* ¶ 603. Mr. Jaffe never tested such a model or evaluated its potential accuracy, and his report offers no methodology for doing either. Zervas Report ¶ 95. Mr. Jaffe cites no record evidence and provides no analysis of COS's existing AI capabilities. *See* Jaffe Report ¶¶ 601–03. Rather than address these shortcomings, Mr. Jaffe's rebuttal report asserts that [redacted] Jaffe Rebuttal ¶ 34. He also asserts, without explanation, that his ability to test an AI model was limited by documents' confidentiality designations. *Id.* ¶ 35.

***Determining "Maximum" Offers (Opinion 8).*** Mr. Jaffe asserts that COS [redacted] Jaffe Report ¶ 604. Mr. Jaffe does not explain the term [redacted] or its significance. *Id.* He based his opinion on the categories of information contained in certain data tables, including tables that were not produced when Mr. Jaffe served his opening report. *Id.* Neither of Mr. Jaffe's reports explains *how* he could identify [redacted] or provides a methodology for doing so.

***Awareness of Rewards "Issues" (Opinion 9).*** Based on one document, Mr. Jaffe asserts that COS was [redacted] *Id.* ¶ 605. Mr. Jaffe provides no technical analysis, does not assess whether the "issues" affected Plaintiffs' challenged transactions, and does not provide any methodology. *Id.*

***Users Terminated for "Gaming" (Opinion 10).*** Mr. Jaffe asserts that COS [redacted] *Id.* ¶ 607. He ran a query that counted the users who [redacted] *Id.* ¶¶ 609–10.

***Users Who Accepted the Terms of Service (Opinion 11).*** Mr. Jaffe asserts COS [redacted] *Id.* ¶ 611. He ran a query that counted the users who clicked [redacted]. *Id.* ¶ 612.

***Identifying Other Information (Opinions 12–16).*** Mr. Jaffe asserts that COS can [redacted] (*id.* ¶ 617). Mr. Jaffe bases these assertions on the fact that [redacted]

[redacted] *Id.* ¶¶ 613–17. He did not investigate or analyze the accuracy or completeness of these tables, and his reports do not provide a methodology for doing so. *See, e.g.*, Jaffe Dep. at 255:7–257:11. Neither of Mr. Jaffe's reports accounts for the fact that user actions—such as using ad blockers, VPNs, or competing extensions—may interfere with COS's data tracking. *Id.* at 257:20–258:2; *see id.* at 36:12–41:10, 44:12–18, 44:22–45:11, 45:20–46:4, 48:10–14. Instead, Mr. Jaffe inferred that [redacted] *Id.* at 259:11–261:23.

Mr. Jaffe does not cite record evidence in support of these opinions. For Opinions 12 and 13, he refers [redacted]. Jaffe Report ¶¶ 613–14 (citing ¶¶ 330–54). For Opinions 14 and 16, he cites [redacted] *Id.* ¶¶ 615, 617 (citing ¶¶ 387–92). And for Opinion 15, he refers to [redacted] *Id.* ¶ 616.

***Reliance on Affiliate Networks (Opinion 17).*** Mr. Jaffe asserts that COS [redacted] *Id.* ¶ 618. He asserts COS could have instead relied on [redacted] *Id.* Mr. Jaffe cites no record evidence and provides no methodology in support of these assertions. Zervas Report ¶ 93. In his rebuttal report, Mr. Jaffe narrows the scope of this opinion, [redacted] Jaffe Rebuttal ¶ 38.

***Data Supports "Under-Rewarded" Purchases (Opinion 18).*** Mr. Jaffe asserts that [redacted] Jaffe Report ¶ 619. He provides no analysis in support of this assertion. Notably, in his summary of Plaintiffs' challenged transactions, Mr. Jaffe was [redacted] *See id.* ¶¶ 442–514. Instead, he relied on [redacted] *See* Jaffe Dep. at 277:22–278:6 [redacted]); *id.* at 270:24–271:24, 274:13–275:14, 278:21–283:9, 284:13–285:7, 287:2–288:8, 290:5–291:20 (similar). He admitted [redacted] *Id.* at 291:21–292:17, 295:1–10. Mr. Jaffe could not articulate a classwide methodology using only COS's data. *Id.* at 295:11–301:9.

## LEGAL STANDARDS

Under Federal Rule of Evidence 702, expert testimony is admissible only if the expert's "specialized knowledge will help the trier of fact," the testimony is "based on sufficient facts or data" and is "the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Rule 702 thus imposes a "gatekeeping obligation" on courts to ensure that expert testimony is "relevant" and "reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

"Scrutiny of expert testimony is especially proper where it consists of an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 145 (4th Cir. 1994) (quoting *E. Auto Distribs., Inc. v. Peugeot Motors of Am., Inc.*, 795 F.2d 329, 338 (4th Cir. 1986) (quotation marks omitted)). Further, "nothing in either *Daubert* or the Federal Rules of Evidence" requires a district court to admit an expert opinion "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## ARGUMENT

### I. MR. JAFFE IS NOT AN EXPERT ON AFFILIATE MARKETING.

An expert must be qualified "by knowledge, skill, experience, training, or education" for his or her testimony to be admissible. Fed. R. Evid. 702; *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989). "The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391–92 (D. Md. 2001). Rather, whether an expert's qualifications are sufficient depends on "the nature of the opinion he offers." *Grande Vista, LLC v. United States*, 680 F. Supp. 3d 550, 561 (D. Md. 2023) (citation omitted).

Here, even if Mr. Jaffe, as a self-styled "data scientist," is qualified to offer expert opinions on data, he is manifestly unqualified to do so regarding affiliate marketing. Mr. Jaffe has never worked in the affiliate marketing industry. *See* Jaffe CV; Jaffe Dep. at 84:5–7, 86:10–12. He has never conducted any academic research on affiliate marketing. *Id.* at 86:13–18. His formal education regarding marketing is limited to his undergraduate coursework. *Id.* at 56:8–12. During his deposition, he attempted to claim expertise in affiliate marketing based on previous litigation work and "YouTube videos." *Id.* at 88:13–91:17. But as his testimony revealed, his knowledge of affiliate marketing derives almost exclusively from his work as a litigation consultant, helping

plaintiffs like Mr. Tollaksen and Mr. Parker sue affiliate marketing companies like COS. *Id.* at 88:13–89:18, 91:18–93:15.

Despite Mr. Jaffe's lack of expertise in affiliate marketing, his reports are jammed with supposed expert analysis of COS's affiliate marketing business. Such analysis occupies almost the first *250 pages* of Mr. Jaffe's opening report, which purports to explain such topics [redacted] *See* Jaffe Report ¶¶ 13–430. Mr. Jaffe should not be permitted to offer his opinions on these topics because he is not an expert on any of them (and also because they merely describe the record evidence, as explained below, *see infra* at 26–28). *See Shreve*, 166 F. Supp. 2d at 391–92 ("[A]n expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering."); *Mission 1st Grp., Inc. v. Mission First Sols., LLC*, 2024 WL 5058007, at *8–9 (E.D. Va. Dec. 10, 2024) (holding witness lacked qualification to testify regarding valuation of trademarks in government contracting context, despite his "expertise in economics generally," where he had little or no experience specific to trademark valuation); *Hetzel v. JPMorgan Chase Bank, N.A.*, 2017 WL 603286, at *2 (E.D.N.C. Feb. 14, 2017) ("Mr. Kadala is an experienced securities investment broker but has no discernible experience in consumer or residential mortgage lending and servicing."); *Est. of Myers v. Walmart Stores, Inc.*, 2011 WL 1366459, at *3 (E.D.N.C. Apr. 11, 2011) (excluding Harvard-educated architect who had no experience in parking lot design as unqualified to offer opinions on parking lot design).

## II. OPINION 4 IS UNSUPPORTED, UNRELIABLE, AND UNHELPFUL.

The centerpiece of Mr. Jaffe's opening and rebuttal reports—his damages calculation purportedly identifying "under-rewarded" purchases for each of COS's rewards types—is beset by a host of factual and methodological errors. Most critically, Mr. Jaffe misunderstands how payouts for [redacted] rewards are calculated, and that basic error leads him to overestimate damages related to [redacted] type reward offers by [redacted], or **approximately 99.9% of the damages he asserts**. Mr. Jaffe's methodology also fails to identify Plaintiffs' challenged transactions or confirm their status as class members. Finally, Mr. Jaffe's speculative assertion that he *could* perform additional analyses—without explaining how—is inherently unreliable and should be excluded.

### A. Mr. Jaffe's Calculation of Purported Damages for [redacted] Type Reward Offers Is Based on a Fundamental Misunderstanding of Basic Facts.

Federal Rule of Evidence 702 requires the proponent of expert testimony to show it is "more likely than not" that the proffered testimony is "based on sufficient facts or data," is "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Accordingly, the Fourth Circuit has long held that expert opinions "should be excluded when [they are] based on assumptions [that] are speculative and are not supported by the record." *Tyger Constr. Co.*, 29 F.3d at 142. This principle applies with special force in the fields of technology and data science. "Technology cannot override human flaws," and "any computer program or algorithm is only as good as the data that goes into it." *United States v. Curry*, 965 F.3d 313, 345 (4th Cir. 2020) (Thacker, J., concurring). "[F]lawed data input produces nonsense output"—in other words, "garbage in, garbage out." *Id.*

Here, Mr. Jaffe's proffered calculation of purported damages for [redacted] offers is based on an unsupported—and objectively incorrect—understanding of the data fields in COS's [redacted]

As explained above, to calculate the rewards due for [redacted] offers, COS multiplies [redacted]. *Supra* at 3–5. Mr. Jaffe, however, erroneously assumed that [redacted] and multiplied it by the gross sale amount. Jaffe Dep. at 149:8–12; *see also id.* at 163:12–18 (similar). Nothing in the record supports Mr. Jaffe's understanding. *See supra* at 5–6.[8] Mr. Jaffe does not cite a single piece of evidence showing that [redacted], and he could not identify any such evidence during his deposition. *See* Jaffe Dep. at 154:18–155:11 ([redacted]); *id.* at 155:12–156:1 (same, regarding documents); *supra* at 5 (collecting testimony). Nor did Mr. Jaffe even look for evidence to support his understanding. *See* Jaffe Dep. at 150:23–151:13 [redacted]); *id.* at 165:4–6, 171:23–172:8, 308:17–309:22 (similar). What is more, he acknowledged multiple instances where the payout_amount field *did not* match the rewards rate shown to the user. *See id.* at 199:22–200:21 (Plaintiff Tollaksen's 15 [redacted] transactions); *id.* at 232:20–25, 241:18–242:17, 245:3–247:1, 305:10–306:4, 307:10–308:12 (other examples). Finally, underscoring the extent of his error, Mr. Jaffe's methodology produces absurd, economically irrational results. *See id.* at 225:24–230:5, 235:10–25 [redacted]); *supra* at 5–6 (discussing additional transactions); Hitt Report ¶ 54.

Courts in the Fourth Circuit exclude proffered expert testimony that, like Mr. Jaffe's, is completely untethered from record evidence. In the Fourth Circuit's seminal decision in *Tyger Construction*, for instance, the court excluded the opinions of a damages expert who purported to

---

[8] As a corollary, Mr. Jaffe's *own report* repeatedly acknowledges that, for [redacted] offers, [redacted] Jaffe Report ¶ 239; *see also id.* ¶ 139 [redacted]).

calculate "increased costs" from "time delays" on a construction site due to "a lack of sand" when the undisputed record evidence showed that "the sand stockpile was never depleted." 29 F.3d at 142–43. Likewise, Judge Novak recently excluded proffered testimony where "significant inputs" of the expert's damages calculations were based on "factual errors." *Hernandez Reid v. Geo Grp., Inc.*, 2026 WL 1365021, at *5 (E.D. Va. May 15, 2026). Mr. Jaffe's proffered testimony here—which overestimates purported damages for [redacted] type rewards by [redacted], Hitt Report ¶ 63—is even more disconnected from the facts of this case, *see Hernandez Reid*, 2026 WL 1365021, at *5 (explaining that, where an expert's report "contains and relies on factual errors that are neither minor nor peripheral, but instead constitute significant inputs," the expert's opinion "must be excluded"); *see also Concordia Pharm., Inc. v. Method Pharm., LLC*, 2016 WL 1464639, at *7 (W.D. Va. Apr. 13, 2016) (similar); *Palmer v. Big Lots Stores, Inc.*, 2015 WL 165315, at *4 (E.D. Va. Jan. 12, 2015) (similar). Exclusion should be the result.

**B. Mr. Jaffe's Methodology Fails to Identify Plaintiffs' Challenged Transactions and Fails to Identify Plaintiffs as Class Members.**

It is axiomatic that expert testimony must be reliable and must fit the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591. Mr. Jaffe's purported damages calculations in Opinion 4 satisfy neither requirement—even setting aside the massive error discussed above.

Mr. Jaffe purports to calculate "[redacted]. *See, e.g.*, Jaffe Report ¶ 568. One would therefore expect Mr. Jaffe's methodology to identify Plaintiffs' own challenged transactions, substantiate Plaintiffs' claimed damages amounts, and confirm Plaintiffs' status as class members. But Mr. Jaffe's methodology does none of these things. His uncorrected methodology identifies only [redacted]. Hitt Report ¶¶ 75, 77. Accounting for Mr. Jaffe's [redacted] error makes the problem even worse—then, his methodology captures

*none* of Plaintiffs' transactions. *Id.* ¶ 76. **If Plaintiffs' claims are taken at face value, in other words, it means Mr. Jaffe's methodology has a *100% error rate*.** *See Daubert*, 509 U.S. at 594 ("[T]he court ordinarily should consider the known or potential rate of error[.]"); *Davis v. Capital One, N.A.*, 2023 WL 6964051, at *11 (E.D. Va. Oct. 20, 2023) (explaining "the extremely high potential rate of error" of an expert's opinion "weigh[ed] heavily against [its] admissibility"), *aff'd*, 2025 WL 2445880 (4th Cir. Aug. 26, 2025).

Moreover, Mr. Jaffe effectively admitted that his methodology does not, by itself, substantiate Plaintiffs' challenged transactions, for which Mr. Jaffe relies [redacted] *See supra* at 7. For instance, when Mr. Jaffe was questioned about Plaintiff Tollaksen's challenged $75.03 Woot purchase (identified as Purchase 22), Mr. Jaffe acknowledged that his methodology yielded purported rewards of $37.50 when applied to this transaction—even though Plaintiff Tollaksen himself claims he is owed only $3.75. Jaffe Dep. at 187:12–189:10; *see also supra* at 5–6. At his deposition, Mr. Jaffe agreed with Plaintiff Tollaksen, testifying that [redacted] Jaffe Dep. at 192:18–21; *see supra* at 5–6. Mr. Jaffe's inability to "identify members of the proposed class with a sufficient—or any—degree of reliability or feasibility" is an independent ground on which to exclude Opinion 4. *Davis*, 2023 WL 6964051, at *11; *see also Johnson v. Time Warner Ent.-Advance/Newhouse P'ship*, 2017 WL 3765551, at *17–18 (D.S.C. Aug. 31, 2017) (excluding testimony that failed to reliably identify class members).

**C. Mr. Jaffe's *Ipse Dixit* Is Unreliable and Unsupported.**

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Thus, "vague *ipse dixit*" testimony is inadmissible under Rule 702. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289 (4th Cir. 2021); *see Small v. WellDyne, Inc.*, 927 F.3d

169, 177 (4th Cir. 2019) ("Without testing … or some basis to assess the level of reliability, expert opinion testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'"). This rule extends to instances where an expert, without substantiation, proffers a methodology that "could potentially be employed at some point in the future." *Davis*, 2023 WL 6964051, at *8.

Here, Mr. Jaffe—perhaps realizing the manifest inadequacy of his proffered methodology—suggests another possibility in footnote 477 of his report. He asserts that he could determine [redacted] that, at the time of his report, had not been produced. Jaffe Report ¶ 560 n.477; Hitt Report ¶ 80; Jaffe Dep. at 100:5–22, 101:7–14. Mr. Jaffe's report, however, does not provide a concrete methodology, or even hint at what such a methodology might be. *See* Jaffe Report ¶ 560 n.477. Not only that, but Defendants produced the data tables Mr. Jaffe identified in footnote 477 on September 22, 2026, Hitt Report ¶¶ 44 n.60, 80–85, yet Mr. Jaffe neither performed an analysis to determine the [redacted] nor provided a methodology for doing so in his rebuttal report, *see* Jaffe Dep. at 111:16–18, 193:11–194:10. In fact, Mr. Jaffe appears not even to have reviewed the "details" of the tables until *the day of his deposition*. *Id.* at 211:15–212:1, 216:20–217:8. His rebuttal report merely asserts that he had [redacted] to perform the analysis and speculates about yet *another* [redacted] containing further unspecified information. Jaffe Rebuttal ¶¶ 31, 119. Mr. Jaffe also does not provide a methodology for analyzing this hypothetical, nonexistent data table. *See id.*[9]

[9] Plaintiffs may argue that Mr. Jaffe did not have sufficient time to conduct an analysis. But Mr. Jaffe repeatedly testified that he could perform his queries in "mere seconds." Jaffe Dep. at 119:4–5; *see also id.* at 191:17–20 [redacted] More fundamentally, Plaintiffs have received extensive discovery—including 500 TB of data and an application program interface with access to billions

Mr. Jaffe's repeated failure to perform any analysis or articulate any methodology to support his bare assertion that he "could" perform some unspecified analysis "at some point in the future" means his testimony is not reliable and not admissible under Rule 702. *Davis*, 2023 WL 6964051, at *8; *see also Sardis*, 10 F.4th at 295–96 (excluding testimony where expert "did not develop a hazard analysis protocol," "did not perform a hazard analysis," and "could not recite a hazard analysis … performed in an analogous context"); *Johnson*, 2017 WL 3765551, at *18 ("[Plaintiff] suggests other data sources exist that might be used to cure the deficiencies. [Plaintiff] has not, however, offered anything more than [the proffered expert's] *ipse dixit* that the sources exist or would suffice[.]").[10]

## III. OPINION 5 IS UNRELIABLE AND SPECULATIVE.

Mr. Jaffe's fifth opinion, concerning allegedly unrewarded purchases, suffers from many of the same flaws as his fourth, concerning allegedly under-rewarded purchases, and it should likewise be excluded as unhelpful to the trier of fact.

*First*, Mr. Jaffe provides no factual basis, reasoning, or methodology whatsoever in support of his assertion that COS [redacted] Jaffe Report ¶ 598; *see* Fed. R. Evid. 702; *Joiner*, 522 U.S. at 146. At his deposition, Mr. Jaffe testified that this pronouncement was based on only two things: [redacted]

of emails—and have had months to prepare their expert reports. If Mr. Jaffe cannot provide a reliable methodology under such circumstances, it is implausible that he could ever do so.

[10] Mr. Jaffe's purported methodology should also be excluded because it is based on assumptions with no record support. *See Tyger Constr. Co.*, 29 F.3d at 142–43; *supra* at 16–18. Mr. Jaffe asserts that his analysis of the [redacted] Jaffe Report ¶ 560 n.477. But Mr. Jaffe cites *no record evidence* in support of this assertion in either of his reports, and he does not explain why he believes the [redacted] affected Plaintiffs or putative class members. Likewise, Mr. Jaffe's assertion—after months of discovery and the production of 500 TB of data—that there must be *another* [redacted] is similarly unfounded. Jaffe Rebuttal ¶ 119.

[redacted] Jaffe Dep. at 250:3–251:9. But Mr. Jaffe did nothing to account for the fact that certain user actions—such as using ad blockers, incognito mode, VPNs, or competing extensions—may interfere with COS's tracking and recording of user data (and, thus, COS's attribution of rewards to users). *See* Jaffe Dep. at 257:20–258:2, 36:12–41:10, 44:12–18, 44:22–45:11, 45:20–46:4, 48:10–14; *see also* Zervas Report ¶ 84; ECF No. 27-1 § 9(a) (Terms of Service provision explaining "Shopping Rewards may also not be available if you use other coupons, other cash back or promotional websites, or if you use a VPN or ad blocker"). Mr. Jaffe does not and cannot articulate a methodology by which COS could identify transactions it was unable to track in the first place, let alone determine whether those purchases were eligible for rewards. Hitt Report ¶¶ 92–108; Zervas Report ¶ 94. At bottom, there is nothing underlying Mr. Jaffe's sweeping classwide conclusion beyond his "vague *ipse dixit*" testimony. *Sardis*, 10 F.4th at 289.

*Second*, Mr. Jaffe's assertion that he [redacted] suffers from the same flaws as his assertion in footnote 477. *Supra* at 20–21. Again, Defendants produced these tables on September 22, yet Mr. Jaffe's rebuttal report not only contains no analysis or methodology *but also* asserts he requires still more (unidentified) data tables to perform his analysis. Jaffe Rebuttal ¶ 119. Mr. Jaffe's opinions regarding unrewarded purchases are unfounded, speculative, and unreliable and should therefore be excluded. *Tyger Constr. Co.*, 29 F.3d at 142; *Davis*, 2023 WL 6964051, at *8.

## IV. OPINIONS 4 AND 5 ARE ADDITIONALLY UNRELIABLE BECAUSE THEY DO NOT ACCOUNT FOR INDIVIDUALIZED ISSUES.

Expert testimony in a putative class action is not reliable if it does not account for individualized factors. *See, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331,

343 (4th Cir. 1998) (reversing class certification and criticizing expert testimony where plaintiffs' expert relied on "averages" without reference to the individual factors); *Good v. Am. Water Works Co.*, 310 F.R.D. 274, 290 (S.D. W. Va. 2015) ("[T]here is considerable danger that Dr. Rosen's formula would ignore important factors unique to individual class members while creating an illusion of precision."); *Davis*, 2023 WL 6964051, at *10 (similar).

Here, Mr. Jaffe's fourth and fifth Opinions both completely ignore the myriad individualized issues at play, providing a further independent basis for exclusion. To start, Mr. Jaffe fails to grapple with individualized facts concerning users' compliance with the terms and exclusions of COS's offers. It is undisputed that the offers COS presents to users may have unique terms and exclusions, such as expiration dates, different rewards rates for different products, or other merchant-specific exclusions. *See, e.g.*, Gauvin Dep. at 47:2–12; Hitt Report ¶¶ 102–03, 107. Mr. Jaffe, however, simply ignores these individualized factors. *Id.* ¶¶ 107–08. To illustrate, if an offer provided a user with 5% rewards back on electronics but 10% rewards back on all other purchases, nothing in Mr. Jaffe's methodology—which, again, consists of multiplying the numbers in two data fields by each other—accounts for which of these two rewards rates a user would actually be entitled to receive. Proving the point, in his analysis of the named Plaintiffs' transactions in his opening report, Mr. Jaffe was [redacted] *See* Jaffe Dep. at 270:24–271:24 ([redacted]); *id.* at 278:21–283:9 (same, [redacted]); *id.* at 284:13–285:7 (same, [redacted]).

Mr. Jaffe also overlooks other individualized questions related to user purchases. It is undisputed that COS may provide users with "goodwill rewards" in certain circumstances. *See,*

*e.g.*, ECF No. 260 at 5. In fact, Plaintiff Tollaksen has received over $1,700 in goodwill rewards, and his receipt of those rewards has already led Plaintiffs to withdraw their challenges as to 12 of Plaintiff Tollaksen's transactions. *See* TOLLAKSEN009910 at 11 (reflecting receipt of $1,793.64 in goodwill rewards); Plaintiff Tollaksen's 5th Supp. Resp. at 39 ([redacted]). Mr. Jaffe, however, made no attempt to account for putative class members' receipt of such goodwill rewards. *See* Hitt Report ¶¶ 72–73. Several other factors—such as use of gift cards, or full or partial returns—may render a user ineligible for rewards on a specific purchase, similarly foreclosing recovery of any damages here. *See, e.g.*, Hitt Report ¶¶ 35, 101; ECF No. 27-1 § 9(a). Mr. Jaffe did not account for those issues, either. *See* Hitt Report ¶¶ 101, 108. Unsurprisingly, in summarizing Plaintiffs' own challenged transactions, Mr. Jaffe was again unable to rely solely on COS's data to uncover the necessary facts. *See* Jaffe Dep. at 277:22–278:6 [redacted]); *id.* at 274:13–275:14 (similar, [redacted]); *id.* at 287:2–288:8 (similar, [redacted]).

Finally, Opinions 4 and 5 do not account for whether users violated the Terms of Service in ways that could have made them ineligible to receive rewards. It is undisputed that some users' actions—such as using ad blockers, incognito mode, VPNs, or competing apps or extensions—may interfere with COS's tracking and recording of user data. *See, e.g.*, Gauvin Dep. at 57:18–58:4, 62:22–63:1; Hitt Report ¶¶ 37, 93; ECF No. 27-1 § 9(a). What is more, because these actions may interfere with COS's tracking, information bearing on a user's eligibility may, in some circumstances, be found only on a user's device. *See* Zervas Report ¶¶ 65–73. Mr. Jaffe does not account for any of these issues, but instead simply ignores them. *See* Hitt Report ¶¶ 94, 97–99. Mr. Jaffe asserts that [redacted]

[redacted]—which obviously is not evidence of the accuracy or completeness of that data. Jaffe Dep. at 259:11–261:23. Likewise, Mr. Jaffe admitted that he did not consider information that might be found on the devices used by Plaintiffs or other members of the putative class to access COS, insisting that even if such information were relevant, it would all be duplicated on COS's servers. *See id.* at 44:12–18 ("[redacted]); *see also id.* at 36:12–41:10, 44:22–45:11, 45:20–46:4, 48:10–14, 119:15–120:7 (similar). That is another factual error, as the examination of Plaintiffs' devices by COS's expert Georgios Zervas demonstrated. *See* Zervas Report ¶¶ 65–73, 96–97. At bottom, Mr. Jaffe's failure to account for any of these individualized issues—which implicate *every single transaction* at issue in this case—renders his reports unreliable. *See Good*, 310 F.R.D. at 290; *Davis*, 2023 WL 6964051, at *10.

## V. MR. JAFFE'S REMAINING OPINIONS AND TESTIMONY SHOULD BE EXCLUDED FOR A HOST OF REASONS.

Mr. Jaffe's remaining 16 opinions—as well as his one-off musings throughout his reports—should also be excluded for multiple reasons. *See* Table Summarizing Jonathan Jaffe's Proffered Testimony. Mr. Jaffe's assertions lack any factual or methodological basis, they constitute impermissible narrative testimony, and they proffer improper legal opinions and speculation about Defendants' state of mind.

### A. Mr. Jaffe's Remaining Opinions Lack Any Factual Basis or Methodology.

The majority of Mr. Jaffe's remaining opinions—many of which consist only of a conclusory paragraph (or sentence) with no analysis, reasoning, or even record citations—should be excluded for the same fundamental reasons as Opinions 4 and 5. For instance, Opinions 1–3, 6, 8, and 12–18 contain no reasoning, no analysis, and no (relevant) record citations. *See* Jaffe Report ¶¶ 555–56, 559, 600, 604, 613–19. For other opinions, Mr. Jaffe improperly draws sweeping

conclusions based on scant record evidence. *See id.* ¶¶ 605–06. The same goes for other "opinions" scattered throughout Mr. Jaffe's report. *See id.* ¶¶ 358 n.318, 367, 376, 383. And Mr. Jaffe's assertions about what COS *could* do with existing or new technology—such as using AI to identify certain categories of offers, using a webpage-identifying tool to scrape purchase data, or identifying "disposable" email address domains using third-party websites—provide no analysis of COS's technological capabilities or the feasibility of implementing his pronouncements. *See id.* ¶¶ 600–04, 616, 618; Zervas Report ¶ 95; *Cape Fear Pub. Util. Auth.*, *Brunswick Cnty. v. Chemours Co. FC, LLC*, 2026 WL 2323094, at *9 (E.D.N.C. Apr. 20, 2026) ("Plaintiffs fail to show by a preponderance that it was technologically feasible to do what [the expert] says defendants should have done.") (collecting cases). All these opinions are the very definition of "vague *ipse dixit*" testimony and should be excluded. *Sardis*, 10 F.4th at 289.

### B. Mr. Jaffe's Report Contains Impermissible Narrative Testimony.

Expert opinions that "are merely [a party's] narrative of the events at issue offered in the guise of expert testimony" are unhelpful to the jury and therefore inadmissible. *Keystone Transp. Sols., LLC v. Nw. Hardwoods, Inc.*, 2019 WL 1756292, at *7 (W.D. Va. Apr. 19, 2019). An expert cannot serve as a mere "mouthpiece"—"simply reading a document into evidence does not require 'scientific, technical, or other specialized knowledge.'" *In re C. R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2018 WL 4219563, at *5 (S.D. W. Va. Sept. 5, 2018) (citation omitted). Accordingly, courts in the Fourth Circuit (and elsewhere) routinely exclude proffered expert testimony that merely provides the expert's "own reading of defendants' internal documents." *Hines v. Wyeth*, 2011 WL 2680842, at *7 (S.D. W. Va. July 8, 2011); *see also Newkirk v. Enzor*, 2017 WL 823553, at *5 (D.S.C. Mar. 2, 2017) (excluding portion of expert report that "merely construct[ed] a factual narrative based upon record evidence"); *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 564 (S.D. W. Va. 2014) (holding relevant documents should be "presented

directly to the jury, not through an expert"); *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010) (excluding expert report where proffered expert merely "regurgitate[d] [record documents] and reache[d] conclusory opinions … purportedly based on [them]").[11]

Here, large swaths of Mr. Jaffe's 330-page opening report are nothing but his impermissible regurgitation of Defendants' internal documents. For example, in paragraphs 88 through 142 of his report, Mr. Jaffe summarizes or screenshots internal COS emails, slide decks, and other documents regarding [redacted], among many, many other things. Most of this discussion is facially irrelevant to Mr. Jaffe's proffered opinions, which—in his own words—are limited to [redacted]. *See id.* ¶¶ 555–619. The same goes for several other sections of Mr. Jaffe's report. *See* Table Summarizing Jonathan Jaffe's Proffered Testimony.

Mr. Jaffe's "own reading of defendants' internal documents," *Hines*, 2011 WL 2680842, at *7, "does not require 'scientific, technical, or other specialized knowledge'" and should be excluded, *C. R. Bard*, 2018 WL 4219563, at *5. Nor, in any event, does Mr. Jaffe have any experience with COS's data systems, affiliate marketing, or merchant contracting that would allow him to assist the jury in understanding these documents. *See supra* at 14–16.

---

[11] Although an expert may rely on record documents, he or she "must draw on the facts only as necessary and in as concise a manner as possible[.]" *In re C. R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2018 WL 514798, at *3 (S.D. W. Va. Jan. 23, 2018) (quotation marks omitted).

### C. Mr. Jaffe's Report Contains Speculative State-of-Mind Testimony.

"[A] party's knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony." *Tyree*, 54 F. Supp. 3d at 518. Such opinions "usurp the jury's fact-finding function" and are thus unhelpful. *Id.* at 517; *see also United States v. Nji*, 159 F.4th 259, 267 (4th Cir. 2025) (affirming exclusion of state-of-mind testimony); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 702–03 (S.D. W. Va. 2014); *In re C. R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2018 WL 4212409, at *3 (S.D. W. Va. Sept. 4, 2018) (similar).

Mr. Jaffe's report is replete with such improper testimony. In Opinion 7, Mr. Jaffe asserts that COS [redacted]. Jaffe Report ¶ 601 (emphasis added). Likewise, in Opinion 9, he asserts—based on one document—that COS [redacted] *Id.* ¶ 605 (emphasis added); *see also id.* ¶ 412 (similar). And he asserts, without citing anything, that COS [redacted] *Id.* ¶ 560 n.477 (emphasis added). Mr. Jaffe even speculates about what [redacted] *Id.* ¶ 248. Mr. Jaffe "is not a mind reader and has 'no experience in divining the concerns or motives of others'" and his proffered testimony should be excluded. *Cape Fear Pub. Util. Auth.*, 2026 WL 2323094, at *9.

### D. Mr. Jaffe's Report Contains Improper Legal Opinions.

Expert testimony "that states a legal standard or draws a legal conclusion by applying law to the facts generally is … inadmissible." *United States v. Coontz*, 810 F. App'x 201, 204 (4th Cir. 2020) (quotation marks omitted). Such testimony is inadmissible because it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Chapman*, 209 F. App'x 253, 269 (4th

Cir. 2006); *see also Brainchild Surgical Devices, LLC v. CPA Glob. Ltd.*, 144 F.4th 238, 257 (4th Cir. 2025) (affirming exclusion of legal opinion testimony).

Mr. Jaffe has repeatedly disclaimed that he is offering legal opinions.[12] Despite these disclaimers, Mr. Jaffe offers legal opinions that COS's conduct [redacted] (*id.* ¶¶ 230, 257). More problematic, Mr. Jaffe asserts in Opinion 17 that COS can [redacted]. *Id.* ¶ 618. Speculating about how COS could rewrite the terms of [redacted]—which Mr. Jaffe does not even cite—is a quintessential legal opinion and should be excluded. *See Advanced Training Grp. Worldwide, Inc. v. Proactive Techs. Inc.*, 2020 WL 4574493, at *9 (E.D. Va. Aug. 7, 2020) (excluding testimony where expert "opine[d] on the interpretation of the contract at issue" and "speculate[d]" about termination justifications).[13]

**E. Mr. Jaffe May Not Present Arithmetic as Expert Opinion.**

Courts across the country exclude proffered expert testimony "based on simple mathematical calculations [that] d[o] not require specialized knowledge." *TruAuto MC, LLC v. Textron Specialized Vehicles, Inc.*, 2021 WL 4167454, at *3 (D.S.C. Sept. 14, 2021); *see also Bradley v. Amazon.com, Inc.*, 2023 WL 2574572, at *20 (E.D. Pa. Mar. 17, 2023) (explaining courts "consistently exclude[ ] expert opinions [that] offer calculations involving only 'simple math'") (collecting cases); *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560,

[12] *See* Jaffe Report ¶ 625 [redacted]); Jaffe Rebuttal ¶¶ 52, 82, 93 (similar); Jaffe Dep. at 113:18–25 [redacted]); *id.* at 114:7–8, 133:6–11, 134:3–5, 204:3–4 (same).

[13] *See also In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6690337, at *4–6 (E.D. Va. Aug. 16, 2021); *Donnert v. Feld Ent., Inc.*, 2013 WL 12097618, at *3 (E.D. Va. Nov. 8, 2013) (similar).

at *19 (D. Del. July 29, 2022) ("[B]asic addition and multiplication … do not require 'specialized knowledge outside a juror's common understanding.'" (citation omitted)).

Here, many of Mr. Jaffe's proffered opinions involve the simplest mathematical exercise of all: counting. In Opinion 10, Mr. Jaffe ran a [redacted] Jaffe Report ¶¶ 609–10. Likewise, in Opinion 11, Mr. Jaffe queried [redacted]. *Id.* ¶ 612. These "expert opinions" are mere tallies of records that met predetermined criteria. Further, Mr. Jaffe testified that such queries [redacted]. Jaffe Dep. at 119:2–5, 191:16–20. Nothing shows Mr. Jaffe's queries required any specialized knowledge or skill, so they should be excluded. *TruAuto MC, LLC*, 2021 WL 4167454, at *3.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court strike the reports and exclude the testimony of Plaintiffs' proffered expert Jonathan Jaffe.

DATED: October 26, 2026

Respectfully submitted,


/s/ *Paul Weeks*
Paul Weeks (VSB No. 89656)
**KING & SPALDING LLP**
1700 Pennsylvania Ave., NW
Suite 900
Washington, DC 20006
Tel.: (202) 737-0500
Fax: (202) 626-3737
pweeks@kslaw.com

/s/ *David L. Balser*
David L. Balser (*pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309

Tel.: (404) 572-4600
Fax: (404) 572-5100
dbalser@kslaw.com

David Lesser (*pro hac vice*)
Jamie Dycus (*pro hac vice*)
Jackie L. Fugitt (*pro hac vice*)
**KING & SPALDING LLP**
1290 Avenue of the Americas
New York, NY 10104
Tel.: (212) 556-2100
dlesser@kslaw.com
jdycus@kslaw.com
jfugitt@kslaw.com

I. Cason Hewgley IV (*pro hac vice*)
**KING & SPALDING LLP**
1100 Louisiana Street
Suite 4100
Houston, TX 77002
Tel.: (713) 751-3200
chewgley@kslaw.com

*Counsel for Defendants Wikibuy Holdings, LLC, Wikibuy, LLC, Capital One Financial Corporation, and Capital One, N.A.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

*/s/ Paul Weeks*
Paul Weeks